UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOUIS KLEIST,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CREDIT SUISSE (USA) LLC, et al.,<br><br>　　　　Defendants. | Case No.  25-cv-09793-AMO<br><br>**ORDER RE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANTS' MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. Nos. 15, 23 |

Plaintiff Louis Kleist's motion for preliminary injunction, Dkt. No. 23, and Defendants Credit Suisse (USA) LLC's and Credit Suisse Securities (USA) LLC's (together, "Credit Suisse") motion to compel arbitration, Dkt. No. 15, were heard before this Court on May 28, 2026.  Having read the papers filed by the parties and carefully considered their arguments therein and those made at the hearing, as well as the relevant legal authority, the Court **DENIES** the motion for preliminary injunction and **GRANTS** the motion to compel arbitration for the following reasons.

## I.     BACKGROUND

### A.     Factual Background

Kleist began his employment with Credit Suisse as a Director of International Wealth Management in January 2019, initially based out of the bank's New York City office.  Kleist Decl. (Dkt. No. 20-1) ¶ 2.  Credit Suisse required him to execute the Employment Dispute Resolution Program ("EDRP") agreement as a condition of his employment.  *See* Kleist Decl. ¶ 6; *id.*, Ex. 1. On or about March 8, 2019, Kleist signed what is known in the securities industry as an "Application for Securities Industry Registration or Transfer," commonly known as a "Form U-4," an industry-standard registration document.  Fox-Lupi Decl. (Dkt. No. 15-3) ¶ 5; *id.*, Ex. A.

United States District Court
Northern District of California

In June 2020, Kleist relocated to the West Coast, working remotely from Spokane, Washington. Kleist Decl. ¶ 3. In 2021, Credit Suisse formally transferred Kleist's employment to its San Francisco office. Kleist Decl. ¶ 5.

In February 2022, Credit Suisse presented Kleist with an Upfront Cash Award certificate ("UCA") which set forth certain terms for him to receive a bonus, including a claw back provision. Kleist Decl. ¶ 6; *id.*, Ex. 2. In May 2022, Credit Suisse eliminated his San Francisco position and issued an ultimatum: transfer back across the country to New York City or be terminated. Kleist Decl. ¶¶ 15, 17. Kleist declined the transfer to New York. Kleist Decl. ¶ 18. Credit Suisse characterized the separation as a voluntary resignation and demanded he repay part of his recent cash bonus pursuant to the UCA's claw back provision. Kleist Decl. ¶ 19.

**B.    Form U-4**

The Financial Industry Regulatory Authority ("FINRA") is a self-regulatory organization ("SRO") with supervisory jurisdiction over participants in the securities industry including (1) "member firms" such as Credit Suisse, and (2) "associated persons" such as Kleist. FINRA's Rules require member firms and associated persons to resolve all industry-related disputes, subject to exceptions not relevant here, through binding arbitration. Kleist was required by FINRA's licensing and registration rules to execute, and in fact did execute on March 8, 2019, his Form U-4 as part of his registration with FINRA. Fox-Lupi Decl. ¶ 5; *id.*, Ex. A.

When Kleist became registered with and licensed by FINRA as an "associated person," he agreed to submit all claims and disputes against Credit Suisse, as his employer, to FINRA's exclusive arbitral jurisdiction. Section 15A, subpart 5, at page 12 of the Form U-4 he executed contains an arbitration clause, which provides as follows:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my *firm* or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs indicated in Section 4 (SRO REGISTRATION) as may be amended from time to time, and that any arbitration award rendered against me may be entered as a judgment in any court of competent *jurisdiction*.

Dkt. No. 15-3 at 15 (emphasis in original).

2

**C.      Procedural Posture**

Credit Suisse initiated a FINRA Arbitration action by filing a statement of claim on September 9, 2025.  *See* Berlajolli Decl. (Dkt. No. 15-4) ¶ 5; *id.*, Ex. A.  The FINRA Arbitration arises out of Kleist's refusal to repay Credit Suisse $238,858.57 after his separation from the bank.  That figure represents a pro rata amount of the $415,105.42 (less withheld taxes) bonus that was accompanied by the UCA, which Credit Suisse paid Kleist on or about February 28, 2022.  *Id.*  The $238,858.57 payback amount is calculated under the UCA's claw back provision on the disputed premise that Kleist voluntarily resigned from Credit Suisse fewer than three months after he was paid the six-figure bonus – Kleist contends that he did not voluntarily resign because Credit Suisse effectively terminated him when he refused to transfer back to New York.

On the same day that Kleist submitted an answer in the FINRA Arbitration, November 13, 2025, he filed his Complaint here.  *See* Dkt. No. 1.  The Complaint lists the following causes of action:

- (1) breach of contract;
- (2) unlawful collection of wages;
- (3) waiting time penalties;
- (4) unfair competition;
- (5) declaratory judgment; and
- (6) "injunction."

*Id.*

Credit Suisse filed the motion to compel this case to arbitration on February 3, 2026.  Dkt. No. 15.

Kleist filed a motion for preliminary injunction on April 23, 2026, more than seven months after Defendants initiated the FINRA Arbitration, and five months before the first evidentiary hearings in the Arbitration are scheduled to commence on October 20, 2026.  *See* Dkt. No. 23.  Through the motion for preliminary injunction, Kleist seeks to halt the FINRA arbitration proceedings.  Dkt. No. 23 at 2.

## II.    DISCUSSION

Both the motion to compel arbitration and motion for preliminary injunction were heard together on Thursday, May 28, 2026.  At the hearing, the parties both acknowledged that the two motions relate to the same issue – whether the case should proceed in the FINRA arbitration.  The Court discusses the motion to compel arbitration first because the legal issues are more squarely addressed in that context.

### A.    Motion to Compel Arbitration

Credit Suisse moves to compel Kleist's claims to arbitration and to stay the case.  Dkt. No. 19.  The Federal Arbitration Act ("FAA") provides that written arbitration agreements in contracts "evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting 9 U.S.C. § 2).  The FAA reflects a "liberal federal policy favoring arbitration agreements."  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991) (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983)).  The FAA "mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985).  However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83 (2002).  Where a valid agreement to arbitrate exists and encompasses the dispute at issue, "then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms."  *Chiron Corp. v. Ortho Diagnostic Systems, Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (internal citations omitted).

When evaluating whether a party is bound by an arbitration agreement, federal courts " 'apply ordinary state-law principles that govern the formation of contracts' to decide whether an agreement to arbitrate exists."  *Norcia v. Samsung Telecomms. Am., LLC,* 845 F.3d 1279, 1283 (9th Cir. 2017) (quoting *First Options of Chi. Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)); *see also Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002) (noting that although the FAA preempts state laws that are only applicable to arbitration agreements, general contract

4

principles and defenses "grounded in state contract law, may operate to invalidate arbitration agreements") (citing *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).  To form a contract under California law, there must be "actual or constructive notice of the agreement" and a "manifest[ation of] mutual assent."  *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512-13 (9th Cir. 2023).  If these foundational elements are satisfied, the agreement shall be enforced so long as it is fair and conscionable.  The plaintiff bears the burden of showing that an arbitration agreement is unconscionable.  *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1260 (9th Cir. 2017); *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 972 (1997) ("a party opposing the petition [to compel arbitration] bears the burden of proving by a preponderance of the evidence any fact necessary to its defense").

### 1.    Application of the FAA to the Form U-4

The FAA makes arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Under the FAA, a court must compel arbitration if: (1) a valid agreement to arbitrate exists, and (2) the dispute falls within the scope of the agreement.  *Geier v. M-Qube Inc.*, 824 F.3d 797, 799 (9th Cir. 2016) (internal citation omitted).

Here, a valid agreement to arbitrate exists.  Credit Suisse's motion to compel Kleist's claims to arbitration rests solely upon the arbitration provision in Kleist's Form U-4 and on FINRA Rule 13200(a).  The Form U-4 includes the following arbitration provision:

> 5. I agree to arbitrate any dispute, claim or controversy that may arise between me and my *firm*, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs indicated in Section 4 (SRO REGISTRATION) as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent *jurisdiction*.

Dkt. No. 15-3 at 15 (emphasis in original).  Kleist does not argue that the arbitration provision contained in the Form U-4 he signed as required by FINRA when his securities license transferred to Credit Suisse, standing alone, is invalid or unenforceable.

Additionally, Kleist's contract and employment claims fall within the scope of the agreement to arbitrate.  FINRA Rule 13200(a) states that "a dispute must be arbitrated under the

United States District Court
Northern District of California

Code [of Arbitration Procedure] if the dispute arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or Associated Persons." Rule 13200(a).[1] The phrase "business activities of a member or an associated person" is broadly construed to include virtually any dispute arising from, for example, an associated person's current or former employment with a member firm. *See, e.g.*, *Monk v. Goldman Sachs & Co. LLC*, No. 22-CV-6056 (JMF), 2023 WL 22618, at *5 (S.D.N.Y. Jan. 3, 2023) (finding a former financial advisor's contract and employment-based claims against FINRA member institution fell within the bounds of a Form U-4 arbitration provision and Rule 13200(a)). Kleist's claims meet this description. Kleist was an associated person following his execution of Form U-4, and the claims arise out of his business activities, which courts have construed to include "employment-related disputes between a FINRA member and an associated person." *Christensen v. Nauman*, 73 F. Supp. 3d 405, 412 (S.D.N.Y. 2014) (collecting cases). Because the claims arise between a FINRA member, Credit Suisse, and an associated person, Kleist, the claims fall within the scope of FINRA Rule 13200.

Applying the governing arbitration provision pursuant to the FAA, the Court must compel the dispute to FINRA arbitration.

### 2. Purported Unconscionability of UCA & EDRP

Kleist resists the conclusion reached above based on a conflation of (1) the EDRP and the UCA, with (2) the arbitration agreement in the FINRA Form U-4. *See* Dkt. No. 20 at 4-5. Kleist argues that the Form U-4 upon which Credit Suisse here relies to compel arbitration must be read in conjunction with the UCA and EDRP because all three agreements fall within a suite of documents governing his employment and accordingly trigger California Civil Code section 1642. *See* Dkt. No. 20 at 4-5. He argues further that none of the dispute resolution provisions contained in the three documents may be used to compel him to arbitration because both the UCA and EDRP, invoked by Credit Suisse within the ongoing FINRA arbitration, fail as both substantively

---

[1] At the hearing, the Court granted Credit Suisse's unopposed request for judicial notice of FINRA Rule 13200. *See* Financial Industry Regulatory Authority, Inc., FINRA RULE 13200 (available at https://www.finra.org/rules-guidance/rulebooks/finra-rules/13200) (last visited May 29, 2026).

and procedurally unconscionable. *Id.* at 6-10. Kleist does not challenge the Form U-4 as unconscionable. The analysis accordingly must first focus on whether, as Kleist insists, the Form U-4 fails as unconscionable based on its relation to the UCA and EDRP. The Form U-4, however, is not part of the same transaction, and the Court need not reach the arguments of the latter two documents' procedural and substantive unconscionability.

Under California law, when multiple contracts are executed as part of a single transaction, they may be "construed together" to clarify the meaning of those contracts. *Alberto v. Cambrian Homecare*, 91 Cal. App. 5th 482, 490 (2023) (internal quotation marks omitted) ("Under Civil Code section 1642, it is the general rule that several papers relating to the same subject matter and executed as parts of substantially one transaction, are to be construed together as one contract."); *see also Cortes v. Univ. & State Emps. Credit Union*, No. 22-cv-00444-LAB-DEB, 2023 WL 12009972, at *4-5 (S.D. Cal. Mar. 13, 2023) (interpreting two agreements entered as part of the same transaction so as to make the terms consistent across the agreements). Contracts which are jointly executed are generally construed in light of each other. *Mountain Air Enters., LLC v. Sundowner Towers, LLC*, 3 Cal. 5th 744, 759 (2017) (citing *Pankow Constr. Co. v. Advance Mortg. Corp.*, 618 F.2d 611, 616 (9th Cir. 1980)). However, California courts have been careful to note that construing contracts together does not render them a single contract for all purposes. *Id.* at 759; *see also Ahern v. Asset Mgmt. Consultants, Inc.*, 74 Cal. App. 5th 675, 693-94 (2022) (explaining that the terms of one agreement are not necessarily incorporated into all other agreements that form distinct parts of a single transaction). Rather, section 1642 is "a rule to aid in the interpretation of contracts and to allow the construction of two contracts together in pursuit of that purpose." *Hartford Accident & Indem. Co. v. Sequoia Ins. Co.*, 211 Cal. App. 3d 1285, 1300 (1989).

Here, the materials fail Civil Code section 1642's test because they do not arise from or relate to the same transaction. Contrary to Kleist's bare averments, the Form U-4 was not executed as part of the same transaction as either the UCA or the EDRP. Kleist agreed to the EDRP as a condition of his employment at the time he joined Credit Suisse in January 2019. *See* Compl. ¶ 44. The EDRP was an agreement between Kleist and Credit Suisse. *See* Kleist Decl.

(Dkt. No. 20-1), Ex. 1.  The Form U-4 was an application for regulatory registration with FINRA, rather than an agreement with Credit Suisse.  Fox-Lupi Decl. (Dkt. No. 15-3), Ex. A.  Moreover, the Form U-4 was executed some two months later in March 2019.  *Id.*  Kleist fails to identify any factual connection between the Form U-4 and the EDRP beyond the fact that they were executed during the early part of his Credit Suisse tenure.  Because the Form U-4 was an agreement regarding licensure between Kleist and FINRA unlike the employment-based EDRP agreement between Kleist and Credit Suisse, and because the Form U-4 was executed months after Kleist's assent to the EDRP, the two agreements do not form part of a single transaction.

The UCA is even more attenuated from the Form U-4 than the EDRP.  The UCA was executed in February 2022, nearly three years after completion of the Form U-4.  *See* Kleist Decl., Ex. 2.  Moreover, the compensation-focused UCA was executed between Kleist and Credit Suisse, while the licensure-focused Form U-4 exists between Kleist and FINRA.  As with the EDRP, Kleist fails to identify any factual connection between the Form U-4 and the UCA that would require the agreements to be construed together under California Civil Code section 1642.

Ultimately, the Form U-4 serves as the basis for the parties to participate in the FINRA Arbitration because the employment-related claims arise between an associated person, Kleist, and a member institution, Credit Suisse.  Kleist fails to demonstrate that the UCA and EDRP should be reviewed at all in assessing the unconscionability of the Form U-4, and his attacks on the enforceability of those agreements fall within the scope of the arbitration.  Because Credit Suisse relies on the Form U-4 as the legal foundation to compel Kleist's claims to FINRA arbitration and Kleist fails to present any contractual defense to the arbitration provision contained in the Form U-4, the Court must compel the case to arbitration.

### B.     Motion for Preliminary Injunction

As noted above, Kleist moves for a mandatory preliminary injunction halting the FINRA arbitration during the pendency of this action.  *See* Dkt. No. 23.  A "preliminary injunction is an extraordinary and drastic remedy" which should not be granted unless the movant shows "substantial proof" and "*by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original; quotation marks and citation omitted).

To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief, (3) the balance of equities tips in the favor of the moving party, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The *Winter* factors may be evaluated on a sliding scale such that preliminary relief may be issued when the moving party demonstrates "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (citation omitted). To grant preliminary injunctive relief, a court must find that "a certain threshold showing [has been] made on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam).

Credit Suisse argues that Kleist fails to establish any of the four requirements for a preliminary injunction. *See* Dkt. No. 26. Credit Suisse's contention that Kleist fails to meet the "irreparable harm" requirement is particularly persuasive and proves sufficient to defeat Kleist's bid for a preliminary injunction.

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)). An unexplained delay in seeking "emergency" injunctive relief undercuts a claim that an injunction is necessary to prevent immediate and irreparable injury. *Miller v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").

Courts consider the type of injunction sought, either mandatory or prohibitory, to be an important factor in assessing the level of harm necessary to warrant a preliminary injunction. A mandatory injunction is "one that goes beyond simply maintaining the status quo and orders the responsible party to take action pending the determination of the case on its merits." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022) (citing *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). "The standard for issuing a mandatory preliminary injunction is high." *Snyder*, 28 F.4th at 111.

9

Here, Kleist plainly fails to establish the level of irreparable harm necessary to warrant the injunction he seeks. Kleist advances that the injunction he seeks would merely preserve the status quo. *See, e.g.*, Dkt. No. 23-1 at 6. Not so. Kleist asks the Court to halt an ongoing FINRA arbitration proceeding – the ongoing arbitration has been the status quo for over seven months, and Kleist asks for relief that goes beyond the preservation of that status quo and thus reflects a mandatory injunction. *Cf. Snyder*, 28 F.4th at 111. Accordingly, Kleist must evidence that extreme or very serious damage will result cannot be compensated in damages. *See Snyder*, 28 F.4th at 111 (quoting *Marlyn Nutraceuticals*, 571 F.3d at 879).

Kleist fails to establish the irreparable harm necessary to support a mandatory injunction through his moving papers. To the contrary, Kleist offers nothing more than speculation and hyperbole. He argues that he will suffer irreparable harm because he will lose if the FINRA arbitration panel continues its work – that the panel will apply the wrong body of law, an award will be issued against him, and he will suffer professionally based on the publication of an adverse award against him in FINRA's Central Registration Depository. *See* Dkt. No. 23-1 at 17-19. Kleist has not and cannot establish that he will lose the California-versus-New York choice of law argument he advances; though he may certainly anticipate that he will lose at arbitration, he does not establish that the arbitration panel will refuse to entertain his argument nor that his anticipated loss is a foregone conclusion. Kleist's unadorned speculation regarding his prospects at arbitration do not reach the high level of irreparable harm necessary to support a negative injunction, much less a mandatory one.

Further, Kleist's failure to demonstrate irreparable harm is exacerbated by the timing of his motion. Credit Suisse initiated the FINRA arbitration by filing their statement of claim on September 9, 2025. *See* Berlajolli Decl. (Dkt. No. 15-4) ¶ 5; *id.*, Ex. A. Kleist subsequently filed the complaint in this lawsuit as well as his answer in the FINRA arbitration on November 13, 2025. *Id.*; Dkt. No. 1. Credit Suisse filed the motion to compel arbitration on February 3, 2026. Dkt. No. 15. Yet Kleist did not file the instant motion for preliminary injunction until April 23, 2026, more than seven months after Credit Suisse initiated the FINRA arbitration, less than five weeks before the first deadlines for production of discovery, and a mere five months from the first

United States District Court
Northern District of California

evidentiary hearings in the arbitration.  Dkt. No. 26.  Kleist offers no meaningful explanation for the delay nor does he address why he needs emergency injunctive relief at this late stage.  Indeed, any emergency posed by potentially participating in the FINRA arbitration appears to be self-manufactured.  The Ninth Circuit's guidance thus proves particularly relevant here – Kleist's "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."  *Miller*, 991 F.2d at 544.

Based on Kleist's failure to demonstrate irreparable harm, the Court must deny the motion for preliminary injunction.

### III.    CONCLUSION

For the foregoing reasons, the Court finds that the FAA requires that this action be compelled to arbitration before FINRA in accordance with the Form U-4.  The Court therefore **DENIES** Kleist's motion for preliminary injunction to halt the arbitration, and the Court **GRANTS** Credit Suisse's motion to compel the action to arbitration.

The Supreme Court instructs, "[w]hen a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."  *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).  The Court accordingly **GRANTS** Credit Suisse's motion to stay and **STAYS** the case.

Given the procedural posture, the Court **ORDERS** that the instant case is **CLOSED** for statistical purposes only.  Nothing contained in this Order shall be construed as a dismissal or disposition of the action, and should further proceedings become necessary herein, any party may initiate them in the same manner as if this Order had not been entered.

//

//

//

//

//

//

//

//

United States District Court
Northern District of California

The parties shall file a joint status report on November 1, 2026, and every 90 days thereafter, to inform the Court of the status of the arbitration proceedings. Within 30 days of the resolution of the arbitration, the parties shall contact the Court and advise whether the case should be terminated and/or identify other actions to be taken.

**IT IS SO ORDERED.**

Dated: May 29, 2026

_____

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

United States District Court
Northern District of California

12